**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

<table>
<tr><td>

ADEIA MEDIA HOLDINGS INC.,

       PLAINTIFF,

V.

FUBOTV INC., FUBO OPERATIONS LLC,
FUBO SERVICES LLC, & FUBOTV
MEDIA LLC (f/k/a FUBOTV MEDIA INC.),

       DEFENDANTS.

</td><td>

CIVIL ACTION NO.:

**JURY TRIAL DEMANDED**

</td></tr>
</table>

### PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT

Adeia Media Holdings Inc. ("Plaintiff" or "Adeia Media") brings this action for patent infringement against FuboTV Inc., Fubo Operations LLC, Fubo Services LLC, and FuboTV Media LLC (f/k/a FuboTV Media Inc.) (collectively, "Defendants"), for infringement of U.S. Patent Nos. 7,818,769 ("the '769 patent"); 8,239,546 ("the '546 patent"); 8,280,987 ("the '987 patent"); and 10,911,509 ("the '509 patent") (collectively, the "Asserted Patents"). Adeia Media, on personal knowledge as to its own acts, and upon information and belief as to all others based on investigation, alleges as follows:

### THE PARTIES

#### A. *Adeia*

1. Plaintiff Adeia Media Holdings Inc. ("Adeia Media") is a Delaware corporation with a principal place of business at 3025 Orchard Parkway, San Jose, California 95134. Adeia Media Holdings is a wholly owned subsidiary of Adeia Inc.

2. Adeia Media Holdings Inc. is referred to herein as the "Plaintiff" or "Adeia Media." Adeia Inc. along with its subsidiaries are referred to herein collectively as "Adeia."

3.    Adeia invents, develops, and licenses fundamental technology that shapes the way millions of people explore and experience entertainment and enhances billions of devices in an increasingly connected world.

4.    Adeia presently owns over 14,000 patents and patent applications worldwide. Adeia's media patent portfolio covers fundamental aspects of the entertainment experience across platforms, including how users discover and stream media content. The Asserted Patents are part of Adeia's media patent portfolio. Adeia's semiconductor patent portfolio covers crucial semiconductor manufacturing technology such as hybrid bonding, advanced processing nodes, and advanced packaging.

5.    Adeia's history of innovation stretches back over 30 years through its predecessor companies such as United Video, Gemstar, TiVo, Macrovision, Rovi, and MobiTV, to name but a few.

6.    Take, for instance, Adeia predecessor United Video. Founded in 1965, United Video was a visionary in broadcasting and entertainment. Its story begins in an era before interactive and digital programming guides existed, when viewers would have to look in a newspaper or paper magazine to find out the schedule for their TV stations. United Video offered one of the first, if not the first, on-screen electronic program guides in North America in 1981. This electronic program guide was not interactive, but instead automatically scrolled through program listings on a dedicated channel. United Video's electronic program guide technology was widely adopted by North American cable systems. United Video continued to innovate in the decades that followed, including through work on interactive program guide technology.

7.    Adeia predecessor Gemstar provides another example. Whether using a printed program guide or a non-interactive electronic program guide like the one pioneered by United

Video to locate shows of interest, programming a VCR to record those shows presented a fresh challenge in the 1980s. The arcane steps required made it inordinately difficult for regular users to record their favorite TV programming. Gemstar set out to make the technology more consumer friendly. Gemstar's first innovation was VCR Plus, which assigned numeric codes to programs so that a single code would tell the VCR how to record the program (what channel, what time, how long, etc.). Gemstar followed that up with its Guide Plus Gold innovation, which permitted users to—via remote control—highlight a program in an interactive on-screen guide, see a detailed description, and program their VCRs to record it with one button click. Gemstar's innovations were widely acclaimed. But Gemstar was not a hardware manufacturer able to mass produce VCRs. Rather, Gemstar licensed its technology to the leading VCR makers, who incorporated it into their products and made them widely available to consumers.[1]

8. Another Adeia predecessor, Macrovision, designed, developed and marketed video security technologies and products that provide copy protection and video scrambling for motion pictures and other proprietary video material. Its business model also centered on licensing its technology, and in 1997, Macrovision technology was estimated to protect 1.5 billion cassettes, primarily Hollywood releases, from unauthorized copying.[2]

9. Macrovision acquired Gemstar, broadening the range of technology it offered to its licensees. Macrovision eventually changed its name to Rovi. Rovi remained active in developing

---

[1] *See, e.g.*, Walter Hamiton & Karen Kaplan, *Can Gemstar Keep Rising?*, LA TIMES, (Aug. 9, 1998), https://www.latimes.com/archives/la-xpm-1998-aug-09-fi-11494-story.html.

[2] *See, e.g.*, Macrovision Corp., SEC Rule 424(b)(4) Filing at 3 (Mar. 14, 1997), https://www.sec.gov/Archives/edgar/data/1027443/000091205797008691/0000912057-97-008691.txt.

new technology, investing over $300 million in research and development from 2014 to 2017 alone.

10.    Rovi also continued to make strategic investments in entertainment-related technologies. For example, in 2011 it acquired Sonic Solutions.[3] Sonic Solutions was a market-leading computer-software company created by former Lucasfilm employees Robert Doris, Mary Sauer, and Andy Moorer, who developed "SoundDroid," a digital audio editing system, as part of the Droid Works project at the Lucasfilm Computer Division. Its technologies were used to restore tens of thousands of recordings, including movie and TV soundtracks. Sonic Solutions even received an Emmy® for outstanding technical achievement for its work in that space.[4]

11.    Similarly, Adeia predecessor TiVo Inc. transformed the television watching experience with its digital video recorders (DVR), ultimately dethroning the VCR as a primary mechanism for household recording of broadcast content. Its first model, the TiVo HDR110, launched commercially in March 1999. TiVo received wide acclaim and recognition for its pioneering work. For example, then-FCC Chairman Michael Powell praised TiVo's innovative technology during a public appearance at the 2003 Consumer Electronics Show, calling it "God's machine." "I can't wait to walk in the house each day to see what it's recorded for me," he continued.[5] In 2007, PC World Magazine awarded the TiVo HDR110 the number 3 spot on its list

---

[3] *See, e.g.*, Don Reisinger, *Rovi to buy Sonic for $720 million*, CNET (Dec. 23, 2010), https://web.archive.org/web/20140305193416/http://news.cnet.com/8301-13506_3-20026481-17.html.

[4] *See, e.g.*, *Sonic Solutions NoNOISE Honored with Emmy Award; Recognized for Groundbreaking Digital Sound Restoration Product*, SONIC SOLUTIONS (Oct. 2, 1996), https://web.archive.org/web/20160305025036/http://www.thefreelibrary.com/Sonic+Solutions+NoNOISE+Honored+with+Emmy+Award;+Recognized+for+...-a018722139.

[5] *See, e.g.*, Benny Evangelista, *PLENTY OF COMPANY / Everybody's talking about TiVo, but the digital video recorder pioneer is just one of many*, SFGATE (Feb. 24, 2003),

of the 50 Best Tech Products of All Time.[6] Time Magazine listed the TiVo DVR as one of the All-TIME 100 Gadgets in 2010, alongside other devices such as Amazon Kindle and Apple iPhone.[7] The original TiVo DVR was in the United States Patent and Trademark Office National Inventors Hall of Fame. TiVo even won three Emmys®—for "Pioneering the Development" of the DVR, "Outstanding Innovation" in "Advanced Media Technology," and "Outstanding Achievement in Interactive Television."[8]

12.     In addition to selling its own hardware that implemented its technical innovations, such as the TiVo HDR110, TiVo also licensed its technology to others in the industry. For example, DISH Network and EchoStar licensed certain important TiVo patents for use in their own DVRs. Additionally, DirectTV offered its customers set-top boxes for its satellite service that incorporated TiVo's DVR technology, which were sometimes referred to as DirecTiVos. Furthermore, TiVo made strategic acquisitions of foundational technology.

13.     In 2016, Rovi acquired TiVo. The combined company continued to be active in its internal research and development efforts and continued to seek out opportunities to acquire other innovative technology companies. One such acquisition was MobiTV.

---

https://www.sfgate.com/business/article/PLENTY-OF-COMPANY-Everybody-s-talking-about-2632474.php.

[6] *See, e.g.*, Christopher Null, *PC World: The 50 best tech products of all time*, MACWORLD (Apr. 1, 2007), https://www.macworld.com/article/185028/50besttech.html.

[7] *See, e.g.*, Peter Ha, *All-TIME 100 Gadgets*, TIME (Oct. 25, 2010), https://content.time.com/time/specials/packages/article/0,28804,2023689_2023681_2023596,00.html.

[8] *See, e.g.*, *Emmy award-winning TiVo service*, TIVO, https://www.tivo.com/assets/popups/popup_emmyaward.html.

14.    Founded in 1999, MobiTV was one of the pioneers in bringing live and on-demand TV to mobile devices, boasting partnerships with numerous content providers, including CNN, CNBC, Fox News Channel, the Weather Channel, ESPN, and ABC News.[9] MobiTV allowed users to receive live streaming content on mobile phones, including events in extremely high demand. In 2010, for instance, MobiTV was used to stream more than 88 million minutes of World Cup coverage.[10] The service was incredibly popular. MobiTV's efforts were recognized as early as 2005 when it won the Emmy Engineering Award for Outstanding Achievement in Engineering Development alongside Sprint Nextel for the companies' live mobile television delivery service.[11] In 2010, MobiTV's app was the second-highest grossing on the Apple AppStore.[12] One of the Asserted Patents was originally filed by MobiTV.

15.    Like its predecessors, Adeia remains committed to technological innovation. Adeia invests tens of millions of dollars per year on research and development.  For example, in 2025 alone, Adeia spent over $67.5 million on research and development.[13] These efforts have contributed to the continued growth of Adeia's patent portfolio. In the past several years alone,

---

[9] *See, e.g.*, Bruce Meyerson, *MobiTV reaches 2 million users*, NBC NEWS (Feb. 28, 2007), https://www.nbcnews.com/id/wbna17388357.

[10] *See, e.g.*, Michael Grotticelli, *MobiTV helps stream over 88 million minutes of live World Cup coverage*, TV TECH (July 12, 2010), https://www.tvtechnology.com/equipment/mobitv-helps-stream-over-88-million-minutes-of-live-world-cup-coverage.

[11] *Emmy Engineering Award Goes to MobiTV, Sprint*, TV TECH (Aug. 25, 2005), https://www.tvtechnology.com/news/emmy-engineering-award-goes-to-mobitv-sprint; *see also Engineering, Science & Technology Emmy Award Recipients*, TELEVISION ACADEMY (Sept. 2, 2025), https://www.televisionacademy.com/awards/engineering-emmys/winners.

[12] *See, e.g.*, Ari Levy & Ian King, *MobiTV to Offer Service on Android Devices After IPhone Success*, BLOOMBERG (June 25, 2010), https://www.bloomberg.com/news/articles/2010-06-25/mobitv-to-offer-service-on-android-devices-after-iphone-success.

[13] Adeia Inc., Annual Report (Form 10-K) at 33 (Feb. 26, 2026).

Adeia's inventors have participated in over thirty joint research partnerships with R&D organizations and academic institutions across the globe. In the semiconductor space, Adeia's engineers are supported by over 3,000 square feet of clean room space and wafer fabrication capabilities.

16.     Beyond Adeia's internal R&D efforts, its intellectual property portfolio has also grown through strategic acquisitions of technology from other leading-edge companies. For example, in 2024, Adeia acquired rights to patented inventions from a global leader in content streaming, Brightcove Inc., including two of the Asserted Patents. Brightcove itself is the recipient of two different Technology & Engineering Emmy® Awards.[14] Some of the patented technology originated from Brightcove's predecessor, Unicorn Media. Unicorn Media pioneered an innovative, cloud-based streaming service called Once. The Once service was designed to make it possible for digital media companies to reliably deliver live or on-demand video to end users across a wide variety of device types through dynamically customized streaming.[15] The Once service delivered patented technology that allowed publishers to ingest content once and receive a single URL that could be requested by any IP-enabled video playback device. On the back-end, the service would dynamically tailor the delivery of the streaming data to account for the needs of the particular device. In addition to tailoring the streams to the device, it could also tailor the content to the user by, for example, inserting personalized ads into the stream to create a seamless, TV-

---

[14] *See, e.g.*, *About Brightcove*, BRIGHTCOVE, https://www.brightcove.com/en/company/about/.

[15] *See, e.g.*, *Brightcove Completes Unicorn Media Acquisition*, BRIGHTCOVE (Jan. 31, 2014), https://www.brightcove.com/en/company/press/brightcove-completes-unicorn-media-acquisition/.

like experience.[16] Unicorn Media's groundbreaking technology garnered industry praise, such as earning top honors in the Digital Video Technology Platform category at the Cynopsis Digital Model D Awards in November 2013.[17]

17.     As another example, Adeia acquired patented inventions from an innovator in cloud-based video delivery, DLVR, Inc., including one of the Asserted Patents. DLVR is a cloud-based video delivery optimization company founded in 2014 and headquartered in Phoenix, Arizona. DLVR developed advanced technology solutions aimed at improving internet video viewing experiences for every user, on every device. DLVR's technology includes an industry-first approach that optimized content delivery by, for example, measuring Content Delivery Network (CDN) performance across a publisher's actual streams and optimized user video requests stream-by-stream, taking into consideration factors that influence the Quality of Experience (QoE) of internet video for end users. DLVR's innovative approach attracted significant industry partnerships, including a partnership with Comcast to provide video delivery optimization services to Comcast CDN customers, with Crunchyroll serving as one of the first joint customers.

18.     Through its licensing program, Adeia places the many valuable innovations represented in its patent portfolios in the hands of consumers via the products and services offered by its licensing partners.

---

[16] *See, e.g.*, *Unicorn Media Announces Support for Adobe HTTP Dynamic Streaming*, UNICORN MEDIA (May 9, 2011), https://www.prnewswire.com/news-releases/unicorn-media-announces-support-for-adobe-http-dynamic-streaming-121490384.html.

[17] *See, e.g.*, Unicorn Media Earns Cynopsis Digital Model D Award For Groundbreaking Unicorn Once™ Solution, UNICORN MEDIA (Nov. 20, 2013), https://www.prnewswire.com/news-releases/unicorn-media-earns-cynopsis-digital-model-d-award-for-groundbreaking-unicorn-once-solution-232651281.html.

19. The identities of the companies who have chosen to become and remain Adeia licensees stand as a testament to the value of the technology Adeia offers. For example, top U.S. pay-TV providers, streaming giants and hardware manufacturers such as AT&T, Verizon, Cox Communications, Comcast, Spectrum, Frontier, Google (YouTube, YouTube TV), Paramount (Paramount+, Pluto TV), Disney (Disney+, ESPN, Hulu), Sony, TCL, Roku, and Samsung have licensed Adeia's media patent portfolio.

### B. *Defendants*

20. Defendant FuboTV, Inc. ("FTI") is a Delaware corporation with a principal place of business at 1290 Avenue of the Americas, 9th Floor, New York, NY 10104. FuboTV has designated Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808 as its agent for service of process.

21. Defendant Fubo Operations LLC ("FOLLC") is a Delaware limited liability company with a principal place of business at 1290 Avenue of the Americas, 9th Floor, New York, NY 10104. Fubo Operations has designated Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808 as its agent for service of process.

22. Defendant Fubo Services LLC ("FSLLC") is a Delaware limited liability company with a principal place of business at 1290 Avenue of the Americas, 9th Floor, New York, NY 10104. FSLLC has designated Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808 as its agent for service of process.

23. Defendant FuboTV Media LLC (f/k/a FuboTV Media Inc.) ("FTVMLLC") is a Delaware limited liability company with a principal place of business at 1290 Avenue of the Americas, 9th Floor, New York, NY 10104. FuboTV Media has designated Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808 as its agent for service of process.

## JURISDICTION AND VENUE

24.     This action includes claims of patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 et seq. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

25.     This Court has general personal jurisdiction over Defendants because each Defendant exists and is incorporated under the laws of Delaware.

26.     This Court also has specific personal jurisdiction over Defendants because each Defendant has established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Defendants, either directly or through subsidiaries or intermediaries, have each conducted business in this District by marketing, selling, offering for sale, and operating its products and services, including each of the accused streaming services that practice the patents and claims asserted in this action. In addition, Defendants distribute streaming media through content distribution networks, which are controlled by Defendants and configured to infringe the Asserted Patents, that deliver streaming content to customers in this District.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1400(b) because each Defendant resides and/or has committed acts of infringement and has a regular and established place of business in the District.

## FACTUAL BACKGROUND

28.     Plaintiff presents its claims and allegations herein in conjunction and/or in the alternative. To the extent that certain claims or allegations may be inconsistent with one another, such allegations should be understood to be made in the alternative.

### A. *Defendants' Infringing Streaming Platform*

29.    The streaming service that infringes the patents-in-suit, as set forth below in greater detail, is the Fubo Service ("Fubo"). This may be referred to herein as the "Accused Service" or "Accused Instrumentality."

30.    Fubo is an over-the-top streaming service that provides live television content to its users from hundreds of live television channels, including live sports, breaking news, awards shows, primetime dramas, daytime soaps, local teams and weather forecasts.

31.    Fubo advertises its streaming service as follows: "Fubo is a service that broadcasts live TV over the internet, no cable required. Watch your favorite teams, network shows, news and movies on 200+ channels. Plus on-demand entertainment including full TV series."[18]

32.    Fubo states that it offers channels like ABC, CBS, and FOX, as well as ESPN, MTV, VH1, SHOWTIME, FX, Comedy Central and Disney Channel among others.[19]

33.    Fubo also offers live and on-demand access to top shows like Survivor, The Simpsons, Abbott Elementary, Bob's Burgers, The Bachelor, Shark Tank, 9-1-1, Yellowstone, Saturday Night Live, Tucker Carlson Tonight, The Rachel Maddow Show, The Conners, Family Guy, Atlanta, The Masked Singer, Law & Order: SVU, Billions, and more.[20]

34.    Not only does Fubo have the NFL, NBA, and MLB, but you can also watch NHL, NASCAR, Champions League, MLS, Ligue 1, Liga MX, golf, tennis, boxing, MMA, college sports and more. Plus, Fubo has every golf major, tennis major and Triple Crown race as well as

---

[18]    *See, e.g.*, *Stream Live TV & Sports*, FUBOTV (last accessed June 24, 2026), https://www.fubo.tv/stream/tv/.
[19] *Id.*
[20] *Id.*

full coverage of specials like the Super Bowl, World Series, NBA Finals, Stanley Cuy Playoffs and Olympics.[21]

35.    Fubo customers can watch on devices such as a computer, iPhone, iPad, Android phone or tablet, Roku, Apple TV, Chromecast, Xbox console, Amazon Fire TV, or smart TV.[22]

36.    Fubo is currently available in the United States, Canada, and Spain. Fubo states that its most popular plan in the United States includes 200+ channels of live sports and TV for half the cost of the average monthly cable bill.[23]

37.    The parties to the Fubo Terms of Service Agreement are FTVMLLC and its parent and affiliates, including but not limited to FTI. The Agreement defines these parties collectively as "Fubo" and states that the Fubo websites, web services, applications and video players are provided and operated by Fubo, as defined in the Agreement.[24]

38.    FTI manages and directs the operation of the Accused Service.

39.    FTI employs and controls executives or other employees responsible for the Accused Service.

40.    FOLLC manages and directs the operation of the Accused Service.

41.    FOLLC employs and controls executives or other employees responsible for the Accused Service.

42.    FSLLC manages and directs the operation of the Accused Service.

---

[21] *Id.*

[22] *See, e.g.*, *What Devices Can I Watch Fubo on?* FUBO HELP CENTER (last accessed June 24, 2026), https://support.fubo.tv/hc/en-us/articles/115002183228-What-devices-can-I-watch-Fubo-on.

[23] *See, e.g.*, *Stream Live TV & Sports*, FUBOTV (last accessed June 24, 2026), https://www.fubo.tv/stream/tv/.

[24] *Terms of Service*, FUBOTV (Sept. 9, 2025), https://legal.fubo.tv/policies/en-US/.

43.    FSLLC employs and controls executives or other employees responsible for the Accused Service.

## B.  *Defendants' Vicarious Liability*

44.    FOLLC is a member-managed limited liability company.

45.    FTI is a member of FOLLC.

46.    FTI is the sole managing member ("manager") of FOLLC.

47.    FTI may not be removed as manager of FOLLC except by its own election.

48.    FTI has the power to direct the activities of FOLLC in the ordinary course of business.

49.    FTI has control over all of the day-to-day business affairs and decision-making of FOLLC.

50.    FTI has the power to direct the activities of FSLLC in the ordinary course of business.

51.    FTI has control over all of the day-to-day business affairs and decision-making of FSLLC.

52.    FTI has the power to direct the activities of FTVMLLC in the ordinary course of business.

53.    FTI has control over all of the day-to-day business affairs and decision-making of FTVMLLC.

54.    FOLLC has the power to direct the activities of FSLLC in the ordinary course of business.

55.    FOLLC has control over all of the day-to-day business affairs and decision-making of FSLLC.

56.     FOLLC has the power to direct the activities of FTVMLLC in the ordinary course of business.

57.     FOLLC has control over all of the day-to-day business affairs and decision-making of FTVMLLC.

58.     FSLLC has the power to direct the activities of FTVMLLC in the ordinary course of business.

59.     FSLLC has control over all of the day-to-day business affairs and decision-making of FTVMLLC.

60.     FOLLC is the sole owner of FSLLC.

61.     FSLLC is the sole owner of FTVMLLC.

62.     One or more of FTI's officers is also an officer of FOLLC.

63.     On March 1, 2026, one or more of FTI's officers was also an officer of FOLLC.

64.     One or more of FTI's officers is also an officer of FSLLC.

65.     On March 1, 2026, one or more of FTI's officers was also an officer of FSLLC.

66.     One or more of FTI's officers is also an officer of FTVMLLC.

67.     On March 1, 2026, one or more of FTI's officers was also an officer of FTVMLLC.

68.     One or more of FOLLC's officers is also an officer of FSLLC.

69.     On March 1, 2026, one or more of FOLLC's officers was also an officer of FSLLC.

70.     One or more of FOLLC's officers is also an officer of FTVMLLC.

71.     On March 1, 2026, one or more of FOLLC's officers was also an officer of FTVMLLC.

72.     One or more of FSLLC's officers is also an officer of FTVMLLC.

73.    On March 1, 2026, one or more of FSLLC's officers was also an officer of FTVMLLC.

74.    FTI profits from the activities of FOLLC.

75.    FTI has the rights, powers, or abilities to cause FOLLC to stop or limit its infringing activities.

76.    FTI has not exercised its rights, powers, or abilities to cause FOLLC to stop or limit its infringing activities.

77.    FTI profits from the activities of FSLLC.

78.    FTI has the rights, powers, or abilities to cause FSLLC to stop or limit its infringing activities.

79.    FTI has not exercised its rights, powers, or abilities to cause FSLLC to stop or limit its infringing activities.

80.    FTI profits from the activities of FTVMLLC.

81.    FTI has the rights, powers, or abilities to cause FTVMLLC to stop or limit its infringing activities.

82.    FTI has not exercised its rights, powers, or abilities to cause FTVMLLC to stop or limit its infringing activities.

83.    FOLLC profits from the activities of FSLLC.

84.    FOLLC has the rights, powers, or abilities to cause FSLLC to stop or limit its infringing activities.

85.    FOLLC has not exercised its rights, powers, or abilities to cause FSLLC to stop or limit its infringing activities.

86.    FOLLC profits from the activities of FTVMLLC.

15

87. FOLLC has the rights, powers, or abilities to cause FTVMLLC to stop or limit its infringing activities.

88. FOLLC has not exercised its rights, powers, or abilities to cause FTVMLLC to stop or limit its infringing activities.

89. FSLLC profits from the activities of FTVMLLC.

90. FSLLC has the rights, powers, or abilities to cause FTVMLLC to stop or limit its infringing activities.

91. FSLLC has not exercised its rights, powers, or abilities to cause FTVMLLC to stop or limit its infringing activities.

92. FTI is vicariously liable for the infringing activities of FOLLC.

93. FOLLC is an agent of FTI.

94. FTI is vicariously liable for the infringing activities of FSLLC.

95. FSLLC is an agent of FTI.

96. FTI is vicariously liable for the infringing activities of FTVMLLC.

97. FTVMLLC is an agent of FTI.

98. FOLLC is vicariously liable for the infringing activities of FSLLC.

99. FSLLC is an agent of FOLLC.

100. FOLLC is vicariously liable for the infringing activities of FTVMLLC.

101. FTVMLLC is an agent of FOLLC.

102. FSLLC is vicariously liable for the infringing activities of FTMVLLC.

103. FTVMLLC is an agent of FSLLC.

C. *Defendants' Actions to Induce Infringement*

104.    Defendants induce end-user customers' infringement by offering for sale subscriptions to, selling subscriptions to, encouraging the download or access of, instructing on the use of, and encouraging the use of the Accused Service.

105.    For example, Defendants operate the Fubo website, which provides end users with instructions on how to use the Accused Service's program guide:

## How do I use the Fubo channel guide?

2 years ago · Updated

Use the Fubo channel guide to find all of the great live and upcoming programming available on channels in your Fubo subscription.

Select your device type below for tips on how to get the most out of using the Fubo channel guide:



Source: FuboTV Support[25]

---

[25] *How do I use the Fubo Channel Guide*, FUBOTV (last accessed June 29, 2026), https://support.fubo.tv/hc/en-us/articles/22283884491277-How-do-I-use-the-Fubo-channel-guide.

# Can I filter my guide to only see certain channels?

1 year ago · Updated

## Overview

Applying a guide **filter** will show you only channels from a specific genre like Sports, News, Movies, and more. Just highlight and select a guide filter to see only the channels from your chosen genre.

Find your device type below for details on how to use guide filters.



- On the **Guide** page of your mobile app, find guide filters along the top of the page
- Scroll left or right to view additional filter options
- *Appearance may vary slightly depending on your device*

Source: FuboTV Support[26]

---

[26] *Can I Filter my Guide to Only See Certain Channels?* FUBOTV (last accessed June 29, 2026), https://support.fubo.tv/hc/en-us/articles/4445730809101-Can-I-filter-my-guide-to-only-see-certain-channels.

106.    Defendants additionally provide guidance to end users on how to set a network as the "home" network in order to access what it markets as the "Unlimited Streams add-on" in connection with the Accused Service.

## What is my Home Network?

1 year ago · Updated

Your home network is the internet connection that you designate as the "Home" for your Fubo subscription. Your home network can only be set on a network connected to a residential internet service provider.

## Why do I need to set up a Home Network?

Setting your home network designates the network as "home" for our Unlimited Streams add-on. Unlimited Streams lets you stream on up to 10 supported devices, connected to your home network.

## Why can't I set my network as the Home Network?

Certain network types cannot be set as a home network. These can include any networks using a Virtual Private Network (VPN) or other proxy connection, or public/shared connections such as a WiFi connection at a store or restaurant, or an intra-office network.

If you're having trouble setting up your home network, click or tap the chat widget at the bottom of this page to get more information and help from our virtual assistant.

Source: FuboTV Support[27]

---

[27] *What is my Home Network?* FUBOTV (last accessed June 29, 2026), https://support.fubo.tv/hc/en-us/articles/360045622272-What-is-my-Home-Network.

21

107.    Defendants' website also provides end users with guidance on how to set up and access the Accused Service.



22

23





3. Select **GET** to download and install the Fubo app.

Source: FuboTV Support[28]

108.    Defendants' website further provides instruction on how end users can record programs streamed via the Accused Service.



[28] *How do I Install the Fubo App?* FUBOTV (last accessed June 29, 2026), https://support.fubo.tv/hc/en-us/articles/360018131532-How-do-I-install-the-Fubo-app.

25

Source: FuboTV Support[29]

109.    Defendants have notice of the Asserted Patents and of Plaintiff's infringement allegations at least as of the filing of this Complaint.

110.    Defendants took the above actions intending to cause infringing acts by others, and/or willfully blinded themselves as to the existence of the Asserted Patents and the Accused Service's infringement thereof.

### COUNT I: INFRINGEMENT OF U.S. PATENT NO. 7,818,769

111.    Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

112.    The '769 patent, entitled "Methods and Apparatus for Implementing Dynamic Program Guides on Mobile Devices," issued on October 19, 2010, and names Gavin Peacock, James Roseborough, David Lowell, Aravind Nallan, and Ian Farmer as inventors. The '769 patent is attached as Exhibit A.

113.    Adeia Media Holdings Inc. owns all rights, title, and interest in the '769 patent, and holds all substantial rights pertinent to this suit, including the right to sue and recover for all past, current, and future infringement.

114.    The '769 patent is valid and enforceable and directed to patentable subject matter.

115.    The notice provisions of 35 U.S.C. § 287 do not apply in this case for the '769 patent, and therefore Adeia has satisfied its obligations under 35 U.S.C. § 287 with respect to the '769 patent.

---

[29] *How Can I Record a Program?* FUBOTV (last accessed June 29, 2026), https://support.fubo.tv/hc/en-us/articles/360038633512-How-can-I-record-a-program

116.    Providing program guide information to users across a wide variety of different types and models of personal devices posed unique technological challenges, particularly given that a single user may have had access to hundreds, if not thousands, of individual channels, and the user's device may have had limited memory or storage resources that it could dedicate to downloading and storing program guide information.

117.    Moreover, when program guides were provided to users as large objects, the user was forced to wait for the entire guide to load before the user could access any of the information in the guide. Hence, "providing program guide information to a mobile device disrupts a user's experience." '769 patent at 1:25-26. Further compounding the issue was that providing program guide information to users' mobile devices could create considerable strain on mobile networks; network conditions, such as lack of bandwidth and latency could, in turn, increase the time it takes to download the full program guide information.

118.    The '769 patent provides a solution to this problem by providing a novel and inventive method for implementing a program guide on a mobile device that takes advantage of the different qualities attributable to two different types of program guide information: structural information and content information. Program guide structural information includes data such as channel identifiers, whereas program guide content information includes information such as the name and timeslot of a given program. While structural information is, compared to content information, generally lighter in terms of size, it can also differ between users depending on factors such as channel package or even geographic restrictions. Content information, conversely, can take up greater space and bandwidth overall, but generally remains static among all users for a given channel.

119.    Rather than require the user to download all the program guide information at once before the user can access any of the program guide information, the claimed invention of the '769 patent allows the user to access this information more readily by using a novel sequence in which the user's mobile device first requests program guide structural information. The mobile device then issues a second request for program guide content information that indicates a requested channel block or time period. This provides numerous advantages in terms of the user's experience:

> As the user views different parts of the guide, the detailed content of the guide is downloaded separately and displayed as needed. There is no need to download the entire guide. Only what the user needs to view is downloaded on demand. Potentially limitless guide data can be downloaded in this manner. Even weeks or months of data can be obtained. The user gets immediate feedback and does not need to wait for the data. The guide is not limited to the memory storage on the device or the service bandwidth. Guide data can be constantly updated since only the visible portion needs to be downloaded.

'769 patent at 7:24–34.

120.    The claimed invention improves the functioning of the mobile device and the network over which it communicates. By transmitting program guide structure information and program guide content information as claimed, the claimed method reduces the time before the guide becomes interactive and eliminates the need to download the entire guide. By retrieving program guide content information only for the requested channel block or time period, the claimed method conserves the limited memory of the mobile device and the constrained bandwidth of the wireless network, and enables the delivery of potentially limitless program-guide data that the device's memory and the network's bandwidth might not otherwise accommodate (and/or could only do so with delays that are disruptive to the user's experience).

121.    The ordered arrangement claimed in the '769 patent was not, at the time of the claimed invention, well-understood, routine, or conventional.  The '769 patent originated from

28

mobiTV, whose pioneering live-mobile-television delivery technology was recognized in 2005 with the Emmy Engineering Award for Outstanding Achievement in Engineering Development.[30]

122.    As the specification explains, conventional approaches to delivering program-guide information to mobile devices downloaded an entire program guide, including substantial blocks of data spanning many hours and thousands of channels, as a single large object, requiring the user to wait for the complete guide to load before any portion could be viewed or navigated. *See* '769 patent at 3:51–4:15.

123.    The claimed invention departs from that conventional practice by dividing the guide data into separately requested program guide *structure* information and program guide *content* information. The specification identifies the prior, large-object download approach as the conventional baseline the claimed invention was designed to overcome, and the particular two-phase architecture recited in claim 1 was not a routine or generic way of delivering such data. The claimed invention provides an unconventional solution to a specific technical problem arising only in the realm of mobile-device, networked program-guide delivery.

124.    Defendants infringe one or more claims of the '769 patent by making, using, selling, and/or offering to sell the Accused Service in this District and elsewhere in the United States, and/or importing the Accused Service into this District and elsewhere in the United States.

125.    Plaintiff provides the following explanation of infringement with regard to an exemplary claim compared to exemplary functionality. Plaintiff reserves the right to present

---

[30] *Emmy Engineering Award Goes to MobiTV, Sprint*, Tv Tech (Aug. 25, 2005), https://www.tvtechnology.com/news/emmy-engineering-award-goes-to-mobitv-sprint; *see also Engineering, Science & Technology Emmy Award Recipients*, Television Academy (Sept. 2, 2025), https://www.televisionacademy.com/awards/engineering-emmys/winners.

additional or alternative explanations of infringement for the claim and functionalities identified below and for other claims and functionalities of the services.

126. Claim 1 of the '769 patent recites: "A method for implementing a program guide on a mobile device." To the extent that this preamble is limiting, Fubo performs this element.

127. Fubo implements an electronic program guide (EPG) in the Fubo app on a mobile device, such as a tablet or mobile phone.



Source: Screenshot of Fubo app on iPad

128. Claim 1 of the '769 patent further recites: "sending a first request from the mobile device to a server, the first request associated with program guide structure information[.]" Fubo performs this element.

129. For example, upon selection of "Guide" in the Fubo app, the Fubo app running on the mobile device sends an HTTP GET request to a Fubo server to receive a listing of channels accessible by the user profile signed into the user client on the mobile device.

130. Claim 1 of the '769 patent further recites: "receiving a first response at the mobile device from the server, the first response associated with program guide structure information, the

program guide structure information including a plurality of channel identifiers[.]" Fubo performs this element.

131. For example, the Fubo app running on the mobile device receives from the Fubo server a response to the HTTP GET request which includes a listing of channels. Each channel listing comprises a "channel_id."

132. The EPG, displayed as a grid by Fubo, is structured based on the program guide structure information defined by the received channel listing.

133. Claim 1 of the '769 patent further recites: "sending a second request from the mobile device to the server, the second request associated with program guide content information, wherein the second request indicates a requested channel block or time period and is sent to the server in response to navigation to a first portion of the program guide generated using the program guide structure information." Fubo performs this element.

134. For example, when the EPG grid is navigated, the Fubo app running on the mobile device sends a second HTTP GET request to the server to receive a portion of the channel listings for a particular time period. Fubo servers receive this second HTTP GET request.

135. Claim 1 of the '769 patent further recites: "receiving a second response at the mobile device from the server, the second response associated with the program guide content information, wherein the program guide content information includes a plurality of program titles for a first plurality of channels in the first portion of the program guide." Fubo performs this element.

136. For example, the Fubo app running on the mobile device receives from the Fubo server a response to the second HTTP GET request including program listings and associated attributes.

137.    The program listings are from channels accessible by the user profile signed into the Fubo app on the mobile device.

138.    As described above, Defendants make, use, sell, and offer for sale Fubo.

139.    As described above, Defendants also test Fubo for development purposes and to ensure quality of service.

140.    In addition or in the alternative, Defendants direct or control the Fubo customers' performance of one or more claimed steps of the '769 patent, condition the benefits of the Fubo service on the performance of those steps, and/or have the power, right, and ability to stop the performance of those steps but decline to do so, and instead profit from their performance. Defendants control access to the Fubo service. Defendants thus condition their customers' use and operation of the Fubo service in a way that would cause the performance of the claimed steps. Thus, the performance of the claimed steps is attributable to Defendants.

141.    Therefore, Defendants directly infringe, literally and/or under the doctrine of equivalents, the '769 patent under 35 U.S.C. § 271(a).

142.    In addition, Defendants have indirectly infringed the '769 patent under 35 U.S.C. § 271(b).

143.    As described above, Defendants have induced infringement by others, such as their respective subsidiaries and end-user customers.

144.    Defendants' advertising, sales, design, development, and/or technical materials related to operation of the Accused Service each contained and continue to contain instructions, directions, suggestions, and/or invitations that invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause Defendants' subsidiaries and customers to directly infringe at least one claim of the '769 patent, either literally or under the doctrine of equivalents.

145.   Furthermore, the ordinary and intended use of the Accused Services by end users, which is induced by Defendants making the Accused Services available, directly infringes at least one claim of the '769 patent, either literally or under the doctrine of equivalents.

146.   Additionally, Defendants have induced infringement by the Accused Service's end-user customers, for example, by implementing the infringing features in the Accused Service, encouraging its users to use that functionality within the United States, requiring its users to use the Fubo app or website in order to access or obtain the Accused Service, and/or instructing, dictating, or training its customers to use the infringing features.

147.   In addition, Defendants sell, offer to sell, advertise, invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause customers to subscribe to the Accused Service.

148.   Defendants took the above actions intending to cause infringing acts by others, and/or it willfully blinded itself as to the existence of the '769 patent and the Accused Service's infringement thereof.

149.   Accordingly, Defendants have indirectly infringed the '769 patent under 35 U.S.C. § 271(b).

150.   Despite their awareness of their infringement of the '769 patent, Defendants continue to infringe.

151.   Defendants' infringement of the '769 patent is willful.

152.   Defendants' acts of infringement have caused damage to Plaintiff. Plaintiff is entitled to recover from Defendants the damages sustained by Plaintiff as a result of Defendants' wrongful acts in an amount subject to proof at trial.

**COUNT II: INFRINGEMENT OF U.S. PATENT NO. 8,239,546**

153.    Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

154.    The '546 patent, entitled "Global Access Control for Segmented Streaming Delivery," issued on August 7, 2012, and names Albert John McGowan as inventor. The '546 patent is attached as Exhibit B.

155.    Adeia Media Holdings Inc. owns all rights, title, and interest in the '546 patent, and holds all substantial rights pertinent to this suit, including the right to sue and recover for all past, current, and future infringement.

156.    The '546 patent is valid and enforceable and directed to patentable subject matter.

157.    The notice provisions of 35 U.S.C. § 287 do not apply in this case for the '546 patent, and therefore Adeia has satisfied its obligations under 35 U.S.C. § 287 with respect to the '546 patent.

158.    The '546 patent is directed to providing concrete, improved systems and methods for controlling access to streaming media assets during segmented streaming delivery. The patent addresses a specific technical problem that arises in cloud-based media delivery architectures that rely on "chunking," such as those that divide a media asset into a plurality of smaller segments for sequential transmission to an end user device over a network. '546 patent at 1:17–27. In such architectures, media content is streamed to end user devices by transmitting segments sequentially, enabling features such as content protection and the ability to seek playback to undownloaded portions of a media asset. *Id.*

159.    The '546 patent identifies a technical deficiency in prior streaming media systems: authentication of whether a user account and user device were authorized to access a media asset

34

was typically performed only once, at the time the user device initially began streaming. *Id.* at 5:50–6:21. Once the initial authentication was confirmed, the computer system responsible for verifying the user's credentials was often separate from the computer system responsible for transmitting the media stream. *Id.* at 6:4–10. As a result, the authenticating system had no ongoing mechanism to determine whether the media stream was still active—for example, whether the user had stopped playback five minutes into a two-hour video or had permitted the video to play in its entirety. *Id.* at 5:62–6:3. This architectural separation between authentication and streaming meant that the system lacked the ability to monitor the ongoing state of a streaming session after initial authorization was granted.

160. This deficiency created a specific technical vulnerability. Because the streaming system performed no session-state monitoring after initial authentication, a second user device linked with the same user account could initiate a separate streaming session while the first device was still receiving content. *Id.* at 6:4–18. The system had no way to detect or prevent this concurrent access. In practical terms, a single subscription-based user account could be used, potentially fraudulently, to stream media assets simultaneously to multiple devices at different physical locations, undermining the content provider's access controls and subscription model. *Id.* at 6:18–36. This problem does not exist outside of networked, segmented streaming media delivery.

161. The '546 patent explains that this problem was "a particular issue where a subscription (e.g., a monthly or yearly subscription) is required to access the media assets." *Id.* at 1:38–41. To solve this problem, the '546 patent discloses and claims a specific technical architecture that integrates one or more mechanisms operating together during a streaming session. *See, e.g.*, *id.* at cl. 1. For example, Claim 1 recites a method that receives "beaconing data" from a

first user device "during transmission" of a media asset, stores "session information" that is "at least partially based on" that beaconing data and that affirmatively "indicates the first user device and the user account have an active session," "determining the first user device is no longer permitted to receive the media asset at least partially due to the first user device no longer being permitted access to the media asset based on at least the session information"; and "ceasing transmission" to the first user device.

162.    The ordered combination of those elements—receiving beaconing data during live transmission, deriving and storing session information affirmatively linked to both the device and the account, and continuously controlling multi-device access based on that session information—constitutes an integrated technical architecture that did not exist before, cannot operate outside of the networked segmented-streaming context and would not preempt all approaches to the underlying problem of multi-device access control. Similarly, the ordered combination was not well-understood, routine or conventional.

163.    The specification confirms that this ordered combination solves a particular technological problem and contains added benefits that did not exist in the prior art. As one example, the ordered combination provides for the added benefit that it enables the possibility of gaining information on the status of the media player via inference. The '546 patent discloses a beaconing mechanism by which a computer system receives data from the end user device during transmission of the media asset. *Id.* at 10:47–65. Rather than relying solely on affirmative status reports from the client media player, which the patent recognizes are not universally available, the system may also derive beaconing data from the pattern and timing of the end user device's requests for media segments and index files. *Id.* at 10:51–53. For example, the system may infer that a user has paused playback if the time between successive requests exceeds the playback

36

duration of the previously requested segment, may infer a skip if a request targets a non-sequential segment, and may determine that the session has stopped if no request is received within a specified timeout period. *Id.* at 10:51–65, 15:60–16:8. This approach transforms what would otherwise be passive content-delivery requests into active session-monitoring signals.

164.    The '546 patent also discloses storing session information linked with the user device and the user account, where that session information is at least partially based on the beaconing data. *Id.* at 12:56–13:7. The stored session information may include identifiers such as the username, the device type, the media asset being streamed, and the session state (*e.g.*, active or inactive). *Id.* This stored session information provides the system with an ongoing, structured record of which user accounts and devices have active streaming sessions at any given moment.

165.    Based on the stored session information, the system also enforces access control on a per-session basis during streaming. When a second user device linked with the same user account attempts to stream a media asset, the system evaluates the stored session information to determine, for example, whether the user account is already linked with the maximum number of permitted active sessions. *Id.* at 18:45–19:16. If the maximum has been reached, the system determines which device is permitted to continue accessing media assets based on configurable rules and can, for example, cease transmission of the remainder of the plurality of media segments to the first user device by withholding subsequent index files so that the first user device cannot retrieve further segments. *Id.* at 14:28–40, 19:48–20:19. 73. This integrated technical architecture provides a concrete improvement to the functioning of cloud-based streaming media delivery systems. Rather than relying solely on an initial, one-time authentication check that is divorced from the ongoing media delivery process, the '546 patent's claimed methods and systems embed access control directly into the segmented streaming pipeline itself. The system derives session state from

the streaming process, stores that state in a structured manner, and uses it to make ongoing access-control decisions. *Id.* at Abstract; 1:46–2:3.

166.    Defendants infringe one or more claims of the '546 patent by making, using, selling, and/or offering to sell the Accused Service in this District and elsewhere in the United States, and/or importing the Accused Service into this District and elsewhere in the United States.

167.    Plaintiff provides the following explanation of infringement with regard to an exemplary claim compared to exemplary functionality. Plaintiff reserves the right to present additional or alternative explanations of infringement for the claim and functionalities identified below and for other claims and functionalities of the services.

168.    Claim 1 of the '546 patent recites: "A method for controlling access to streaming media assets during streaming." To the extent that this preamble is limiting, the Accused Service performs this element.

169.    Fubo controls access to streaming media assets during streaming.

170.    Fubo limits the number of simultaneous streams permitted for a given user account at any given time, depending on a combination of factors such as the type of plan the user is subscribed to, the location(s) of the devices streaming the media assets, and the type of device(s) used to stream content.

##  Device Limits by Plan

### US-English Plans (All Current)

These plans include **Family Share** + **Unlimited Screens:**

- Stream on up to 10 devices simultaneously when connected to your **Home Network**
- Stream on up to 3 additional devices **outside the home** using mobile devices or web browsers
- **Total of 13 simultaneous streams** (10 at home + 3 on the go)

### Latino Plan

Includes **Standard Share** by default:

- Stream on **2 devices** at the same time
- Add **Family Share** and/or **Unlimited Screens** to increase device limits
- ➡️ Learn more: **How do I make changes to my Fubo subscription?**

## 📍 Streaming Fubo from One Location

When streaming Fubo from a single location:

- You can stream on multiple devices, based on your subscription plan
- All devices must be connected to your **Home Network**
  - For help setting up your Home Network, see: **What is my Home Network?**

 **Note:** If you have multiple internet networks in your home, these will count as multiple locations, which can affect your device limits

39

✌️ **Streaming Fubo from Different Locations**

You can stream Fubo content from different locations using certain devices:

☑ **Mobile devices and web browsers**

- Stream from different locations simultaneously

☑ **Connected TV devices and Smart TVs** (e.g., Apple TV, Roku, Fire TV, Android TV, Samsung Smart TV, Xbox One):

- Can be used from any location
- Can only be used from **one location** at a time

💡 **Note:** If you try to stream on a TV device from two different locations at the same time, you'll receive an error indicating too many locations are in use.

Source: FuboTV Support[31]

171.    Claim 1 of the '546 patent further recites: "commencing transmission of a media asset to a first user device, wherein the first user device is linked with a user account, and transmission of the media asset comprises sequential transmission of a plurality of media segments[.]" The Accused Service performs this element.

172.    When a user selects a given piece of content to stream, Fubo transmits the content to the user's device.

---

[31] *How Many Devices Can I Stream Fubo from at the Same Time?* FUBO HELP CENTER (last accessed June 24, 2026), https://support.fubo.tv/hc/en-us/articles/11500140248-How-Many-Devices-Can-I-Stream-Fubo-From-at-the-Same-Time.



Source: Screenshot Taken During Use of Fubo

173.    Fubo requires the user to be logged into a valid and active user account to stream content.



Source: FuboTV Website[32]

174.    Fubo transmits the content in sequential chunks.

---

[32] *Fubo – Watch & DVR Live Sports & TV Online*, FUBOTV (last accessed June 24, 2026), https://www.fubo.tv/signin.

175.     Claim 1 of the '546 patent further recites: "receiving during transmission of the media asset to the first user device, beaconing data from the first user device[.]" The Accused Service performs this element.

176.     For example, during transmission of media assets, Fubo collects information from the user's device, such as IP address information, location estimation, browser characteristics, device IDs and characteristics, platform type and operating system.

177.     Fubo collects data that is periodically transmitted from the user's device during playback of a media asset. This data is sent from the user's device to a remote host associated with Fubo at a configured interval while the media asset is being received.

178.     Claim 1 of the '546 patent further recites: "storing session information linked with the first user device and the user account, wherein: the session information is at least partially based on the beaconing data received from the first user device, and the session information indicates the first user device and the user account have an active session of receiving the media asset[.]" The Accused Service performs this element.

179.     For example, Fubo stores session information based on the collected data. The session information is linked with a user's account and a first device, including for example based on session identifiers and device identifiers, and indicates that the device has an active media-streaming session.

180.     Claim 1 of the '546 patent further recites: "receiving authentication information linked with a second user device and the user account while transmission of the media asset to the first user device is occurring[.]" The Accused Service performs this element.

181.     For example, a second device may log into Fubo using credentials which match those used to log into the first device while the first device is in an active streaming session.

182.    Claim 1 of the '546 patent further recites: "determining the first user device is no longer permitted to receive the media asset at least partially due to the first user device no longer being permitted access to the media asset based on at least the session information[.]" The Accused Service performs this element.

183.    For example, when Fubo determines that a second device linked to the user account is seeking to access streaming content while other device(s) linked to the user account are already in an active session, it may determine that the user account is not authorized to begin another stream based on various factors such as the user's subscription, geographic location(s) of the devices, and the type(s) of device being used to stream.

184.    When a device linked to the user account attempts to stream media and doing so would exceed the permitted number of concurrent streams, Fubo displays a warning message stating that the user account has reached the maximum number of streams, and that proceeding may cause another instance of the user account, such as on the first user device, to be disconnected.



Source: Screenshot Taken During Use of Fubo

185.    Claim 1 of the '546 patent further recites: "ceasing transmission of a remainder of the plurality of media segments to the first user device, wherein ceasing transmission of the remainder of the plurality of media segments results in the first user device not receiving the media asset in its entirety." The Accused Service performs this element.

186.    For example, when a device linked to the user account attempts to stream media in excess of the permitted number of concurrent streams, Fubo displays a warning message stating that the user account has reached the maximum number of streams, and that proceeding may cause another instance of the user account, such as on the first user device, to be disconnected.

187.    If the user of the second device chooses to continue, Fubo will cease transmission of the content that was being streamed to said one or more other devices linked to the user account, such as the first user device.



Source: Screenshot Taken During Use of Fubo

44

188.    As described above, Defendants make, use, sell, and offer for sale the Accused Service.

189.    As described above, Defendants also test the Accused Service for development purposes and to ensure quality of service.

190.    In addition or in the alternative, Defendants direct or control Defendants' third-party cloud service and CDN providers' performance of those steps and/or has the power, right, and ability to stop the performance of those steps but declines to do so, and instead profits from their performance of those steps. For example, Defendants have contracts with its third-party cloud service and CDN providers. Thus, the performance of the claimed steps is attributable to Defendants.

191.    Therefore, Defendants directly infringe, literally and/or under the doctrine of equivalents, the '546 patent under 35 U.S.C. § 271(a).

192.    In addition, Defendants have indirectly infringed the '546 patent under 35 U.S.C. § 271(b).

193.    As described above, Defendants have induced infringement by others, such as their respective subsidiaries and end-user customers.

194.    Defendants' advertising, sales, design, development, and/or technical materials related to operation of the Accused Service each contained and continue to contain instructions, directions, suggestions, and/or invitations that invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause Defendants' subsidiaries and customers to directly infringe at least one claim of the '546 patent, either literally or under the doctrine of equivalents.

195. Furthermore, the ordinary and intended use of the Accused Services by end users, which is induced by Defendants making the Accused Services available, directly infringes at least one claim of the '546 patent, either literally or under the doctrine of equivalents.

196. Additionally, Defendants have induced infringement by the Accused Service's end-user customers, for example, by implementing the infringing features in the Accused Service, encouraging its users to use that functionality within the United States, requiring its users to use the Fubo app or website in order to access or obtain the Accused Service, and/or instructing, dictating, or training its customers to use the infringing features.

197. In addition, Defendants sell, offer to sell, advertise, invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause customers to subscribe to the Accused Service.

198. Defendants took the above actions intending to cause infringing acts by others, and/or it willfully blinded itself as to the existence of the '546 patent and the Accused Service's infringement thereof.

199. Accordingly, Defendants have indirectly infringed the '546 patent under 35 U.S.C. § 271(b).

200. Despite their awareness of their infringement of the '546 patent, Defendants continue to infringe.

201. Defendants' infringement of the '546 patent is willful.

202. Defendants' acts of infringement have caused damage to Plaintiff. Plaintiff is entitled to recover from Defendants the damages sustained by Plaintiff as a result of Defendants' wrongful acts in an amount subject to proof at trial.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 8,280,987

203.    Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

204.    The '987 patent, entitled "Cloud Data Persistence Engine," issued on October 2, 2012, and names Albert J. McGowan and Richard L. Carls as inventors. The '987 patent is attached as Exhibit C.

205.    Adeia Media Holdings Inc. owns all rights, title, and interest in the '987 patent, and holds all substantial rights pertinent to this suit, including the right to sue and recover for all past, current, and future infringement.

206.    The '987 patent is valid and enforceable and directed to patentable subject matter.

207.    The notice provisions of 35 U.S.C. § 287 do not apply in this case for the '987 patent, and therefore Adeia has satisfied its obligations under 35 U.S.C. § 287 with respect to the '987 patent.

208.    Effectively and efficiently providing content to users across a large geographic area presented unique technological challenges. In a typical data hosting architecture, servers—each with the same content—would be deployed across a geographical area such that a user could connect to the server closest to it in terms of distance and access the same content as a user located elsewhere in the same geographical area. While those arrangements allowed for quick access to data stored on a server, they also required that the same data be on each server when that may not be efficient. Moreover, data requested may vary by location, so if all data is maintained at every server, there is significant inefficiency presented by storing data that is infrequently, if at all, accessed. *See* '987 patent 1:17–37.   This problem does not arise outside of the realm of geographically distributed networked data delivery systems.

209.    The '987 patent provides a solution to this problem. The inventors addressed these challenges in data networks by providing a method for using a "cloud data persistence" engine or system that allows the data objects served at each server to vary depending on the server's clients' historical data requests. The efficiencies provided by the inventions are numerous:

> For example, by storing only data objects that are frequently and/or recently accessed by clients, the servers may require significantly less storage space because they do not need to store a potentially large amount of data objects that are infrequently accessed or have not recently been accessed. A related benefit of this may be that by decreasing the amount of storage necessary at each server, the speed of access to the storage at the servers may be increased. For example, instead of relying on hard drives, solid state drives (which may cost significantly more per megabyte, but may offer improved access times) may be used for the storage at the servers.

'987 patent, 4:64–5:5.

210.    These advantages—reducing server storage space requirements, increasing the speed of access of server data (thereby decreasing latency at the client)—are particularly acute for live streaming-media content delivery. To stream content using adaptive streaming (*e.g.*, allowing video quality to vary during playback based on current conditions such as network traffic and client bandwidth), streaming services typically deliver manifests to clients that provide them with information about where to find the appropriate video segments. For live content, the future video segments may not yet exist and thus cannot be included in the manifest, meaning that updated manifests must be continually provided as the broadcast proceeds. Efficient manifest delivery is thus especially important in the live context because clients will need to receive updated manifests every few seconds (*e.g.*, every 3–10 seconds, depending on configurations) to locate the next segments/chunks of media content for playback. What is more, live transmissions are often of interest to particular geographic locations: generally, sporting events, for example, are most viewed in the regions that the sports teams hail from, and excess storage across every server in a network would be a poor use of resources.

211.    Using servers connected in the manner described in the claims further provides the benefit of efficient updating of data objects, which may include manifests or components of manifests:

> In such instances, the modification to the data object (assuming the client has the appropriate access rights) may be routed to the data object origin server by a server receiving the request from the client. The modification may be applied to the relevant data at the data object origin server. The data object origin server may then send a notification to other servers, or only the cache servers that have the previous version of the data stored, that the previous version of the data is no longer valid. These servers may in turn send a notification to other associated servers, or only those servers that have the previous version of the data stored, that the previous version of the data object is no longer valid. This may prevent a client from receiving an out-of-date version of the data no matter which server is accessed by the client. The modified data residing at the origin may then propagate out to the other servers as requests are made by clients to those servers for the data object.

'987 patent, 5:37–51.

212.    The backend architecture described in the specification also provides additional technological improvement:

49



**FIG. 5A**

'987 patent, Fig. 5A; *see also* '987 patent at 9:38–45 ("Important to note, data objects may be stored separate from media assets. For example, a data object containing information linked to a particular media asset may not be stored in the same location as the media asset. For example, a media asset may reside on multiple servers that are part of a content delivery network, while the data object that contains information about the media asset is stored in some other location, possibly on some other network.").

213.  That is further reflected in the claims. For example, claim 14 requires the use of an application server located at a first location and the use of a data object comprising a link to a

media asset stored at a separate, second location distinct from the first location. This architecture—where data objects are separated from the media they point to—can provide significant technical benefits. Because manifest requests and video segment requests from a client are received separately, separating the manifest generation system from other systems that handle video segments allows for the manifest generation system to be better optimized for its function. And "the system's modularity enables it to be scaled to accommodate differing hardware capacities, and because the system can be configured to dynamically allocate hardware to different services according to the needs of the system, the speed of completing tasks relating to a particular event can further be increased." *Id.* at 8:56–61.

214.    Moreover, the components recited in the claims were unconventional, non-routine, and were not well-understood at the time of the invention, either considered alone or as an ordered combination. For example, claim 14 recites a specific and unconventional architecture requiring an application center, cache server, and origin server, all connected in a specific way and each performing specific tasks that enable the operation of the overall system.

215.    The '987 patent originated from Unicorn Media, whose cloud-based Once streaming service received top honors in the Digital Video Technology Platform category at the Cynopsis Digital Model D Awards in November 2013.[33] Brightcove, which acquired Unicorn Media and developed related technology, is the recipient of two Technology & Engineering Emmy® Awards.[34]

---

[33] *See, e.g.*, Unicorn Media Earns Cynopsis Digital Model D Award For Groundbreaking Unicorn Once™ Solution, UNICORN MEDIA (Nov. 20, 2013), https://www.prnewswire.com/news-releases/unicorn-media-earns-cynopsis-digital-model-d-award-for-groundbreaking-unicorn-once-solution-232651281.html.

[34] *See, e.g.*, *Brightcove Completes Unicorn Media Acquisition*, BRIGHTCOVE (Jan. 31, 2014), https://www.brightcove.com/en/company/press/brightcove-completes-unicorn-media-acquisition/.

216.   Defendants infringe one or more claims of the '987 patent by making, using, selling, and/or offering to sell the Accused Service in this District and elsewhere in the United States, and/or importing the Accused Service into this District and elsewhere in the United States.

217.   Plaintiff provides the following explanation of infringement with regard to an exemplary claim compared to exemplary functionality. Plaintiff reserves the right to present additional or alternative explanations of infringement for the claim and functionalities identified below and for other claims and functionalities of the services.

218.   Claim 14 of the '987 patent recites: "A method for retrieving data objects using a cloud data persistence system configured for distribution of data[.]" To the extent that this preamble is limiting, the Accused Service performs this element.

219.   For example, Fubo uses a cloud-based architecture that includes data storage at various points in the system to distribute live media content and associated manifests and metadata.

220.   Claim 14 of the '987 patent further recites: "receiving, by an application center, a first request from a client for a data object[.]" The Accused Service performs this element.

221.   For example, Fubo uses Content Delivery Networks (CDNs) such as Fastly for manifest delivery, which receive incoming requests from clients for manifests at, for instance, a server within a Point of Presence (POP).

222.   Claim 14 of the '987 patent further recites: "wherein . . . the application center is one of a plurality of application centers that communicate with a plurality of clients[.]" The Accused Service performs this element.

223.   For example, the CDNs, such as Fastly, used by the Accused Service include multiple POPs comprising multiple servers that each communicate with multiple clients.

224.   Claim 14 of the '987 patent further recites: "wherein . . . the application center is located at a first location[.]" The Accused Service performs this element.

225.   For example, Fubo uses CDNs for manifest delivery. The Fastly POP server that receives the manifest request is located at a first location.

226.   Claim 14 of the '987 patent further recites: "wherein . . . the data object comprises a link to a media asset[.]" The Accused Service performs this element.

227.   For example, Fubo receives a request for a manifest. The manifest comprises a link to a media asset.

228.   Claim 14 of the '987 patent further recites: "wherein . . . the media asset is stored at a second location separate from the first location[.]" The Accused Service performs this element.

229.   For example, Fubo delivers manifests through a first CDN, such as Fastly, while delivering the linked media assets via a second CDN, such as Akamai.

230.   Claim 14 of the '987 patent further recites: "determining, by the application center, the data object is not stored among a first plurality of data objects stored at the application center[.]" The Accused Service performs this element.

231.   For example, Fubo uses CDNs such as Fastly for manifest delivery. When a Fastly POP server receives a request for a manifest, it determines if the requested manifest is not among the manifests stored on that POP server.

232.   Claim 14 of the '987 patent further recites: "transmitting, by the application center, a second request for the data object to a first cache server[.]" The Accused Service performs this element.

233.    For example, when the Fastly CDN POP server that receives the request for a manifest determines that the requested manifest is not stored, it makes a request for the manifest to a CDN cache server.

234.    Claim 14 of the '987 patent further recites: "wherein: the first cache server is communicatively coupled with the plurality of application centers; and the first cache server is one of a plurality of cache servers[.]" The Accused Service performs this element.

235.    For example, Fastly includes multiple CDN cache servers coupled to the CDN POP servers.

236.    Claim 14 of the '987 patent further recites: "receiving, by the cache server, the second request for the data object[.]" The Accused Service performs this element.

237.    For example, the Fastly CDN cache server receives a request for the manifest from the CDN POP server that receives the request for a manifest.

238.    Claim 14 of the '987 patent further recites: "determining, by the cache server, the data object is not stored among a second plurality of data objects stored at the cache server[.]" The Accused Service performs this element.

239.    For example, when the Fastly CDN cache server receives a request for a manifest, the cache server determines if the requested manifest is not among the manifests stored on that cache server.

240.    Claim 14 of the '987 patent further recites: "transmitting, by the cache server, a third request for the data object to an origin server, wherein the origin server is communicatively coupled with the plurality of cache servers[.]" The Accused Service performs this element.

241. For example, when the Fastly CDN cache server determines that the requested manifest is not stored, it makes a request for the manifest to a Fubo origin server. The origin server is communicatively coupled with multiple Fastly CDN cache servers.

242. Claim 14 of the '987 patent further recites: "receiving, by the origin server, the third request for the data object[.]" The Accused Service performs this element.

243. For example, the Fubo origin server receives a request for the manifest from the Fastly CDN cache server.

244. Claim 14 of the '987 patent further recites: "locating, by the origin server, the data object among a third plurality of data objects[.]" The Accused Service performs this element.

245. For example, the Fubo origin server locates the requested manifest from among the manifests stored.

246. Claim 14 of the '987 patent further recites: "transmitting, by the origin server, the data object linked to the third request to the cache server[.]" The Accused Service performs this element.

247. For example, the origin server transmits the requested manifest to the Fastly CDN cache server.

248. Claim 14 of the '987 patent further recites: "receiving, by the cache server, the data object linked to the third request[.]" The Accused Service performs this element.

249. For example, the Fastly CDN cache server receives the requested manifest.

250. Claim 14 of the '987 patent further recites: "transmitting, by the cache server, the data object linked to the second request[.]" The Accused Service performs this element. *See supra.*

251. For example, the Fastly CDN cache server transmits the requested manifest to the Fastly CDN POP server that received the request for a manifest.

252. Claim 14 of the '987 patent further recites: "receiving, by the application center, the data object linked to the second request[.]" The Accused Service performs this element. *See supra*.

253. For example, the Fastly CDN POP server that received the request for a manifest receives the requested manifest.

254. Claim 14 of the '987 patent further recites: "transmitting, by the application center, the data object linked to the first request to the client." The Accused Service performs this element.

255. For example, the Fastly CDN POP server that received the request for a manifest transmits the requested manifest to the client.

256. As described above, Defendants make, use, sell, and offer for sale the Accused Service.

257. As described above, Defendants also test the Accused Service for development purposes and to ensure quality of service.

258. In addition or in the alternative, Defendants direct or control Defendants' third-party cloud service and CDN providers' performance of those steps and/or has the power, right, and ability to stop the performance of those steps but declines to do so, and instead profits from their performance of those steps. For example, Defendants have contracts with its third-party cloud service and CDN providers. Thus, the performance of the claimed steps is attributable to Defendants.

259. Therefore, Defendants directly infringe, literally and/or under the doctrine of equivalents, the '987 patent under 35 U.S.C. § 271(a).

260. In addition, Defendants have indirectly infringed the '987 patent under 35 U.S.C. § 271(b).

261. As described above, Defendants have induced infringement by others, such as their respective subsidiaries and end-user customers.

262. Defendants' advertising, sales, design, development, and/or technical materials related to operation of the Accused Service each contained and continue to contain instructions, directions, suggestions, and/or invitations that invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause Defendants' subsidiaries and customers to directly infringe at least one claim of the '987 patent, either literally or under the doctrine of equivalents.

263. Furthermore, the ordinary and intended use of the Accused Services by end users, which is induced by Defendants making the Accused Services available, directly infringes at least one claim of the '987 patent, either literally or under the doctrine of equivalents.

264. Additionally, Defendants have induced infringement by the Accused Service's end-user customers, for example, by implementing the infringing features in the Accused Service, encouraging its users to use that functionality within the United States, requiring its users to use the Fubo app or website in order to access or obtain the Accused Service, and/or instructing, dictating, or training its customers to use the infringing features.

265. In addition, Defendants sell, offer to sell, advertise, invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause customers to subscribe to the Accused Service.

266. Defendants took the above actions intending to cause infringing acts by others, and/or it willfully blinded itself as to the existence of the '987 patent and the Accused Service's infringement thereof.

267. Accordingly, Defendants have indirectly infringed the '987 patent under 35 U.S.C. § 271(b).

268.    Despite their awareness of their infringement of the '987 patent, Defendants continue to infringe.

269.    Defendants' infringement of the '987 patent is willful.

270.    Defendants' acts of infringement have caused damage to Plaintiff. Plaintiff is entitled to recover from Defendants the damages sustained by Plaintiff as a result of Defendants' wrongful acts in an amount subject to proof at trial.

### COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 10,911,509

271.    Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

272.    The '509 patent, entitled "Configuring Manifest Files Including Redirect Uniform Resource Locators," issued on February 2, 2021, and names Michael Gordon as inventor. The '509 patent is attached as Exhibit D.

273.    Adeia Media Holdings Inc. owns all rights, title, and interest in the '509 patent, and holds all substantial rights pertinent to this suit, including the right to sue and recover for all past, current, and future infringement.

274.    The '509 patent is valid and enforceable and directed to patentable subject matter.

275.    The notice provisions of 35 U.S.C. § 287 do not apply in this case for the '509 patent, and therefore Adeia has satisfied its obligations under 35 U.S.C. § 287 with respect to the '509 patent.

276.    Online streaming services, such as the Accused Service, frequently utilize a distributed architecture in which the transmission of streaming content to a user employs multiple CDNs which are operated independently of one another. This distributed approach, in which the streaming service operator generally sends the user device a manifest directing the user device to

where the streaming media assets are located, circumvents the worst shortcomings of conventional single-CDN streaming approaches which lack the ability to flexibly distribute or reassign streaming traffic (e.g., in response to network conditions) without interrupting the user experience.

277.    However, the use of this adaptive, multi-CDN approach is not without its own pitfalls from the perspective of streaming service operators. Once the streaming service delivers the manifest to the user's device, the device will independently request segments of the desired media content from different CDNs, some of which may be operated by third parties. Under this arrangement, those third-party CDNs, and not the streaming service operator, are ultimately responsible for the user's actual experience when using the streaming service; the operator of the service cannot directly observe the quality of service those third-party CDNs actually provide to the operator's customers. *See* '509 patent at 12:10–19. And, due to the closed software environments of mobile browsers and operating systems, the operators may not always be able to use client-side tools to monitor the quality of service provided to its customers. *Id.* at 6:3–36. This problem does not arise outside the realm of networked third-party-CDN served streaming.

278.    The inventor of the '509 patent sought to solve this problem by providing a method by which streaming service operators could obtain performance metrics associated with a second independently operated CDN. This method provides for configuring of the manifest files served to users with URLs directed to a first CDN, where said first CDN is in turn configured to respond to requests for those URLs with redirect messages that point to corresponding URLs at a second CDN which is separately and independently operated from the first CDN. The system can then identify data metrics associated with the URLs requested from the first CDN, such as TCP packet-level metrics, and, based upon those metrics, determine performance metrics associated with the second CDN, such as a bitrate upshift/downshift, buffering event, or server failure.

279. This, in turn, allows the streaming service operator to determine the performance of the CDNs used to transmit content to the service's customers. Because the manifest file serving system configures the manifest and directs the requesting device's URL requests to the first CDN, which in turn issues redirect messages routing those requests to the second, separately operated CDN, the system is positioned to observe data metrics associated with the requests for video segment files that might otherwise be unobservable. From these data metrics associated with the requests directed to the first CDN, the system can determine one or more performance metrics associated with the second CDN, rather than relying on the CDNs themselves to self-report their performance. This server-side measurement architecture enables the streaming service operator to evaluate and compare the performance of independently operated CDNs, to allocate video-delivery volume among them, and to reassign delivery to a different CDN by updating the manifest file accordingly—improvements in the management of multi-CDN adaptive streaming. *See* '509 patent at 113:9–19.

280. This arrangement of steps, as recited in the claims, was unconventional, non-routine, and was not well-understood at the time of the invention, either considered alone or as an ordered combination. In particular, the claimed inventions provides an unconventional solution to a specific technical problem arising only in realm of networked third-party-CDN served streaming.

281. DLVR's innovative technology has attracted significant industry partnerships, including a partnership with Comcast to provide video delivery optimization services to Comcast CDN customers, with Crunchyroll serving as one of the first joint customers. DLVR's video delivery optimization service was also recognized in 2017 with the TV Technology Product Innovation Award, which recognizes excellence in products serving the TV and professional video

industries based on criteria including innovation of concept and design and creative use of technology, with winners selected by a panel of professional users.[35]

282.    Defendants infringe one or more claims of the '509 patent by making, using, selling, and/or offering to sell the Accused Service in this District and elsewhere in the United States, and/or importing the Accused Service into this District and elsewhere in the United States.

283.    Plaintiff provides the following explanation of infringement with regard to an exemplary claim compared to exemplary functionality. Plaintiff reserves the right to present additional or alternative explanations of infringement for the claim and functionalities identified below and for other claims and functionalities of the services.

284.    Claim 7 of the '509 patent recites: "A method of configuring and providing manifest files for adaptive streaming video[.]" To the extent that this preamble is limiting, the Accused Service performs this element.

285.    Fubo is an online streaming platform where users can stream live television programs via the Internet. Fubo configures and provides manifest files for adaptive streaming video.

---

[35] *Winners of 2017 Produce Innovation Awards Announcement* (Dec. 15, 2017), https://www.tvtechnology.com/news/winners-of-2017-product-innovation-awards-announced.



Source: FuboTV Home Page[36]

286.    Claim 7 of the '509 patent further recites: "receiving, by a manifest file serving system and from a requesting device, a request for a manifest file corresponding to an adaptive streaming video[.]" The Accused Service performs this element.

287.    For example, the Fubo uses a manifest file serving system that receives requests for manifest files corresponding to an adaptive streaming video from a requesting device, such as a device running the Fubo app.

288.    Claim 7 of the '509 patent further recites: "determining, by the manifest file serving system, a first content delivery network (CDN) to serve a plurality of redirect messages corresponding to the requested adaptive streaming video, wherein the first CDN corresponds to a first Internet domain[.]" The Accused Service performs this element.

---

[36] *Fubo – Watch Live Sports & TV Without Cable TV*, FuboTV (last accessed June 24, 2026), https://www.fubo.tv/welcome.

289.    For example, Fubo's manifest file serving system selects a first CDN, corresponding to a first Internet domain, to serve a plurality of redirect messages (e.g., HTTP 301 Moved Permanently responses) that correspond to certain segments of the requested adaptive streaming video. The first CDN may be, for example, Fastly.

290.    Claim 7 of the '509 patent further recites: "determining, by the manifest file serving system, a second content delivery network (CDN) to serve a plurality of video segment files corresponding to the requested adaptive streaming video, wherein the second CDN corresponds to a second Internet domain different from the first Internet domain; and wherein the second CDN is operated separately and independently from the first CDN[.]" The Accused Service performs this element.

291.    For example, Fubo's manifest file serving system determines a second CDN to serve certain video segment files corresponding to the requested adaptive streaming video. The second CDN has a different internet domain from the first CDN and is operated separately and independently from the first CDN. The second CDN may be, for example, Google's CDN.

292.    Claim 7 of the '509 patent further recites: "configuring, by the manifest file serving system, a manifest file corresponding to the requested adaptive streaming video, wherein the configured manifest file includes a plurality of uniform resource locators (URLs) requesting video segment files and directed to the first domain to be served by the first CDN, wherein the first CDN is configured to respond to requests for each of the plurality of URLs with redirect messages instructing requestors to request corresponding URLs within the second domain to be served by the second CDN[.]" The Accused Service performs this element.

293.    Fubo's manifest file serving system configures a manifest file for the requested adaptive streaming video. The manifest file includes multiple URLs for video segment files

directed to the first CDN's domain (e.g. Fastly). The Fastly CDN is configured to respond to the URLs with redirect messages (e.g. HTTP 301 Moved Permanently responses) that instruct the recipient to request corresponding URLs of the second CDN (e.g. Google).

294.    Claim 7 of the '509 patent further recites: "transmitting, by the manifest file serving system, the configured manifest file comprising the plurality of URLs to the requesting device[.]" The Accused Service performs this element.

295.    For example, in response to the HTTP request for the manifest, Fubo's manifest file serving system transmits the configured manifest file as a response to the requesting user device. The Fubo app running on the device uses the manifest file to request video segments for streaming.

296.    Claim 7 of the '509 patent further recites: "identifying data metrics associated with receiving a plurality of uniform resource locators (URLs) requesting video segment files from the first CDN[.]" The Accused Service performs this element.

297.    For example, when Fubo receives video segment file requests via the Fastly CDN and responds with redirect messages, it also identifies metrics associated with those requests. Examples of these metrics include request timing, the fact that particular points within the manifest/stream have been reached, and the current streaming bitrate.

298.    Claim 7 of the '509 patent further recites: "determining one or more performance metrics associated with the second CDN, based on the received data metrics associated with a plurality of uniform resource locator (URL) requests for video segment files received by the first CDN." The Accused Service performs this element.

299.    For example, Fubo determines performance metrics associated with the second CDN (e.g. Google) based on the data metrics discussed above, which allow Fubo to indirectly

64

monitor delivery and quality of service information for segments ultimately provided by the second CDN.

300.    As described above, Defendants make, use, sell, and offer for sale the Accused Service.

301.    As described above, Defendants also test the Accused Service for development purposes and to ensure quality of service.

302.    In addition or in the alternative, Defendants direct or control Defendants' third-party cloud service and CDN providers' performance of those steps and/or has the power, right, and ability to stop the performance of those steps but declines to do so, and instead profits from their performance of those steps. For example, Defendants have contracts with its third-party cloud service and CDN providers. Thus, the performance of the claimed steps is attributable to Defendants.

303.    Therefore, Defendants directly infringe, literally and/or under the doctrine of equivalents, the '509 patent under 35 U.S.C. § 271(a).

304.    In addition, Defendants have indirectly infringed the '509 patent under 35 U.S.C. § 271(b).

305.    As described above, Defendants have induced infringement by others, such as their respective subsidiaries and end-user customers.

306.    Defendants' advertising, sales, design, development, and/or technical materials related to operation of the Accused Service each contained and continue to contain instructions, directions, suggestions, and/or invitations that invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause Defendants' subsidiaries and customers to directly infringe at least one claim of the '509 patent, either literally or under the doctrine of equivalents.

65

307.   Furthermore, the ordinary and intended use of the Accused Services by end users, which is induced by Defendants making the Accused Services available, directly infringes at least one claim of the '509 patent, either literally or under the doctrine of equivalents.

308.   Additionally, Defendants have induced infringement by the Accused Service's end-user customers, for example, by implementing the infringing features in the Accused Service, encouraging its users to use that functionality within the United States, requiring its users to use the Fubo app or website in order to access or obtain the Accused Service, and/or instructing, dictating, or training its customers to use the infringing features.

309.   In addition, Defendants sell, offer to sell, advertise, invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause customers to subscribe to the Accused Service.

310.   Defendants took the above actions intending to cause infringing acts by others, and/or it willfully blinded itself as to the existence of the '509 patent and the Accused Service's infringement thereof.

311.   Accordingly, Defendants have indirectly infringed the '509 patent under 35 U.S.C. § 271(b).

312.   Despite their awareness of their infringement of the '509 patent, Defendants continue to infringe.

313.   Defendants' infringement of the '509 patent is willful.

314.   Defendants' acts of infringement have caused damage to Plaintiff. Plaintiff is entitled to recover from Defendants the damages sustained by Plaintiff as a result of Defendants' wrongful acts in an amount subject to proof at trial.

## JURY DEMAND

315.   Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Adeia Media Holdings Inc. asks this Court for an order granting the following relief:

A.   A judgment in favor of Plaintiff that Defendants have infringed, either literally and/or under the doctrine of equivalents, the '769, '546, '987, and '509 patents;

B.   A judgment and order finding that Defendants' infringement has been willful;

C.   A permanent injunction prohibiting Defendants from further acts of infringement;

D.   A judgment and order requiring Defendants to pay Plaintiff its damages, costs, expenses, and any enhanced damages to which Plaintiff is entitled for Defendants' infringement;

E.   A judgment and order requiring Defendants to provide an accounting and to pay supplemental damages to Plaintiff, including without limitation, pre-judgment and post-judgment interest;

F.   A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding Plaintiff its reasonable attorneys' fees against Defendants; and

G.   Any and all other relief as the Court may deem appropriate and just under the circumstances.

Dated: July 1, 2026                         Respectfully submitted,

Of Counsel:                                 FARNAN LLP

Bradley W. Caldwell                         /s/ Brian E. Farnan
Jason D. Cassady                            Brian E. Farnan (Bar No. 4089)
John Austin Curry                           Michael J. Farnan (Bar No. 5165)
Brian D. Johnston                           919 N. Market St., 12th Floor
Caldwell Cassady & Curry PC                 Wilmington, DE 19801
2121 N Pearl St., Suite 1200                Tel: (302) 777-0300

67

Dallas, TX 75201
Telephone: (214) 888-4848
bcaldwell@caldwellcc.com
jcassady@caldwellcc.com
acurry@caldwellcc.com
bjohnston@caldwellcc.com

bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Adeia Media Holdings Inc.*